```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION
```

Martha E. Pettibone,           :

    Plaintiff,              :

  v.                           :    Case No. 2:12-cv-0932

Commissioner of Social         :    JUDGE MICHAEL H. WATSON
   Security,                         Magistrate Judge Kemp
                                          :
    Defendant.

### REPORT AND RECOMMENDATION

#### I.  Introduction

Plaintiff, Martha E. Pettibone, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits.  That application was filed on April 27, 2010 and alleged that plaintiff became disabled on October 2, 2009.  She later amended the onset date to November 1, 2009.

After initial administrative denials of her application, plaintiff was given a hearing before an Administrative Law Judge on September 7, 2011.  In a decision dated September 22, 2011, the ALJ denied benefits.  That became the Commissioner's final decision on August 31, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on December 21, 2012.  Plaintiff filed her statement of specific errors on January 25, 2013.  The Commissioner filed a response on May 8, 2013.  Plaintiff filed a reply brief on May 13, 2013, and the case is now ready to decide.

#### II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 61 years old at the time of the administrative hearing and who has a high school education,

testified as follows.  Her testimony appears at pages 83-107 of the administrative record.

Plaintiff worked in a dental office for many years.  She was an office manager/receptionist.  Her job duties included receiving and stocking supplies, and lifting up to twenty pounds.  She was also on her feet for the majority of the day.  In her last year at work, she had slowed down due to fibromyalgia and fatigue.  She also developed arthritis pain, irritable bowel syndrome, and depression.

Plaintiff testified that fibromyalgia affected her neck and shoulders, lower back, hips, knees and ankles.  It was diagnosed in 1999 and worsened over the years.  She experienced muscle spasms in her shoulders and calves and weakness in her ankles, as well as numbness and tingling in her fingers.  Additionally, she did not sleep well due to pain and became fatigued during the day to the point of having to lie down.

Plaintiff further testified that she has arthritis and other problems with her knees, with the left knee being worse than the right.  She also had noticed worsening of her irritable bowel syndrome, which she attributed to stress.  It often caused her to need to use the bathroom without advance warning.  The medication she was taking for fibromyalgia, called Cyclobenzaprine, made her groggy, and she would not have been able to do her regular job while taking that medication.

Plaintiff was asked how often she might have to miss work due to pain or other issues.  She thought that she would be unable to go to work four or five days per month, on average.  She could do occasional but not frequent lifting and could climb stairs once in a while, but not often.  At home, she does some cooking, does not wash dishes, does laundry with assistance, and shops for groceries infrequently due to fatigue.

### III. The Medical Records

The medical records in this case are found beginning on page 252 of the administrative record.  The pertinent records (those relating to plaintiff's physical condition) can be summarized as follows.

Plaintiff saw Dr. Martin for knee pain in May, 2010.  She reported long-standing pain which had recently gotten worse.  Physical examination revealed some tenderness and crepitus with flexion and extension of her knees, but they were both stable.  X-rays of her knees showed some spurring but joint space was well-preserved.  Ankle films were normal.  Dr. Martin diagnosed bilateral arthritis in the knees, exacerbated by a recent fall, and an ankle sprain.  He recommended anti-inflammatory medication and physical therapy.  (Tr. 267).  Subsequently, he injected her left knee.  (Tr. 352).

In July, 2010, plaintiff saw Dr. Hannallah for neck and back pain.  He diagnosed degenerative disc disease and lumbago and recommended that an MRI be done and that injections be considered, along with cessation of smoking and weight loss.  (Tr. 286-87).

Dr. Brown, whose office submitted various treatment notes, completed a physical residual functional capacity questionnaire on December 3, 2010.  Her diagnoses included fibromyalgia and irritable bowel syndrome.  Dr. Brown thought that plaintiff could sit an hour at a time and up to five hours in a workday, could stand for four hours total, and could walk for one hour.  She could not lift and carry over ten pounds and could not use her feet for repetitive movements.  Also, plaintiff could not bend, squat, crawl, climb stairs, or reach above her shoulders, and she had to avoid machinery, unprotected heights, changes in temperature and humidity, and exposure to dust, fumes and gases.  Finally, Dr. Brown said that plaintiff's fatigue prevented her from regularly working eight-hour days.  (Tr. 362-63).

Dr. Brown again expressed her views about plaintiff's physical capabilities in a letter dated August 16, 2011. There, she said that due to a combination of fibromyalgia, cervical pain, lumbar spine pain, bilateral knee pain, and gastrointestinal impairments, plaintiff had been unable to work since December, 2009. Dr. Brown confirmed that plaintiff "experiences a generalized feeling of weakness, insomnia, fatigue and general malaise" and that she "is not a malingerer." Dr. Brown also referred to the treatment given by Dr. Hannallah and Dr. Martin and noted that a bone density scan of the lumbar spine and left hip showed osteopenia. She cited various clinical signs such as recurrent muscle tenderness and stiffness in the neck and back, restrictions in the range of motion of both the cervical and lumbar spines, a slow gait, and a depressed mood. Dr. Brown mentioned irritable bowel syndrome as well. She thought plaintiff had profound fatigue and reduced stamina, and that she would need to lie down for 1-3 hours daily for pain relief and because of insomnia. She would also miss more than four days of work per month. (Tr. 421-22).

Plaintiff was put on a regiment of physical therapy after a 2011 motor vehicle accident. She reported that the exercises caused pain, as did daily activities such as yard work. The exercises did eliminate tingling in her hand, however. The only other records show that plaintiff followed up with Dr. Martin in 2012 for both arm and knee pain, and that she was exercising to reduce the arm pain.

Additionally, although not part of the formal medical records, the file does contain some information from state agency physicians. In explaining the initial denial of plaintiff's claim, a Dr. Sagone concluded, in a report dated August 17, 2010 and which was based on a handful of records, that plaintiff could do a relatively full range of light work, with the only non-

exertional limitation being avoiding heights and hazardous machinery due to "body habitus." (Tr. 122-24). As part of the reconsideration decision, Dr. Hinzman, another state agency physician, concluded, in a document dated October 30, 2010 (which predates either of Dr. Brown's reports about disability) that plaintiff could do a reduced range of light work. He apparently based that opinion on records concerning her degenerative disc disease and degenerative joint disease in the spine and knees; his report mentions no limitations from fibromyalgia. (Tr. 136-37).

### IV. The Vocational Testimony

A vocational expert, Mr. Coleman, also testified at the administrative hearing. His testimony begins at page 107 of the record. He characterized plaintiff's past work as a receptionist as sedentary and semi-skilled and the office manager job as light and semi-skilled, although plaintiff performed the job at the medium level on occasion.

Mr. Coleman was asked some questions about a hypothetical person who could perform a limited range of light work, being able to stand or walk for only four hours a day, and being unable to climb ladders, ropes or scaffolds. That person could occasionally stoop, crouch or crawl, could not kneel, and had to avoid all exposure to unprotected heights and hazardous machinery. With those restrictions, that person could, in Mr. Coleman's view, do "the essential function" of plaintiff's past work.

Mr. Coleman was then asked about a person with the functional limitations described by Dr. Brown, the treating physician. He testified that the restrictions found in Exhibit 11, one of Dr. Brown's evaluations, would preclude competitive employment, as would the limitations in Exhibit 19, specifically the need to miss at least four days of work per month or the need

to lie down for one to three hours per day.

      V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 33 through 43 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through December 31, 2014.  Next, plaintiff had not engaged in substantial gainful activity from her alleged onset date through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including fibromyalgia, degenerative disc disease of the spine, degenerative joint disease, arthritis, synovitis, and osteopenia.  The ALJ concluded that neither irritable bowel syndrome nor depression were, on this record, severe impairments.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform a reduced range of light work.  Specifically, the ALJ determined that plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could operate hand or foot controls, could stand or walk for a total of four hours in a workday, could sit about six hours, could not kneel or climb ropes, ladders or scaffolds, could not work at unprotected heights or around hazardous machinery, and could occasionally climb ramps and stairs, stoop, crouch, and crawl.  The ALJ found that, with these restrictions, plaintiff could perform her past relevant work as an administrative clerk.  Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

      VI.   <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, plaintiff raises three issues. She argues that (1) the ALJ did not properly evaluate the treating source opinions; (2) the ALJ did not properly evaluate her complaints of pain; and (3) the ALJ relied on improperly-substantiated vocational testimony. The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's first assignment of error relates to the ALJ's

refusal to give controlling or significant weight to Dr. Brown's opinions, which, if accepted, would lead to a finding of disability. According to plaintiff, the ALJ's primary rationales - that the two reports authored by Dr. Brown are inconsistent with each other, and that Dr. Brown appears simply to have accepted plaintiff's self-report of disabling symptoms - are not supported by the record, and that the ALJ failed both to articulate valid reasons for rejecting Dr. Brown's opinions and failed to comply with Blakley v. Comm'r of HHS, 581 F.3d 399 (6th Cir. 2009) by not discussing the other relevant factors set forth in 20 C.F.R. §404.1527.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(d); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.

Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004). Finally, the ALJ cannot simply reject completely and without explanation a treating source opinion which is not given controlling weight; rather, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." Blakley v. Comm'r of Social Security, 581 F.3d 399, 406 (6th Cir. 2009).

Here, the ALJ explained his decision not to give controlling weight to Dr. Brown's opinions in this way:

> Dr. Brown's opinions have not been assigned controlling weight because his (sic) opinions are internally inconsistent with one another, despite the fact that they were rendered only eight months apart, with no documented corresponding event that could reasonably account for this change in his (sic) opinion. Based on this inconsistency, it appears that Dr. Brown relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant in formulating these opinions, and it also appears that he (sic) uncritically accepted as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exists good reasons for questioning the reliability of the claimant's subjective complaints. Moreover, it should be noted that the possibility always exists that a doctor may express an opinion in an effort to assist a patient which whom he or she sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

> In sum, the above residual functional capacity assessment is supported by the opinions of Dr. Sagone (Exhibit 1A, pages 8 through 11) and Dr. Hinzman (Exhibit 3A, pages 9 and 10). It is also well-supported by the record as a whole.

(Tr. 28).

Plaintiff argues that the inconsistency noted by the ALJ between Dr. Brown's two opinions is largely illusory. The Court agrees. The fact that a doctor includes in a subsequent evaluation some additional limitations not included in a prior evaluation may cause a reasonable person to reject those additional limitations if, as here, there has been no material change in the claimant's condition, but it does not justify rejecting *both* evaluations, especially when the ultimate conclusion of both is essentially the same - that plaintiff had, at most, the capacity to perform a very limited range of sedentary work. As the vocational expert testified, even Dr. Brown's less restrictive opinion would, if adopted as plaintiff's residual functional capacity, preclude all competitive work. The opinions are therefore more consistent than not, and consistent on the dispositive issue in the case, so that rejecting both of them on the basis of fairly minor differences is simply unreasonable.

The ALJ based his rejection of Dr. Brown's opinions not only on this basis, but because, in his view, the supposedly startling change in Dr. Brown's views could be explained only by attributing to Dr. Brown a wholesale and uncritical adoption of plaintiff's own self-report of symptoms. The administrative decision also contains what appears to be "boilerplate" language about how sometimes treating sources give in to insistent patients by rendering opinions they do not actually hold, but there is no evidence in this case suggesting that is what happened, so these comments are properly disregarded. And

because the change in Dr. Brown's views from one opinion to the next is hardly the type of radical shift in viewpoint that would cause a reasonable person to suspect the authenticity of Dr. Brown's assessment, the Court - taking the ALJ at his word, as the Court must do under Wilson - is left with strikingly little to justify a wholesale rejection of the treating source opinion.

That is not the only flaw in the administrative decision. First, the decision does not state explicitly how much weight was given to Dr. Brown's opinions once the ALJ decided not to give them controlling weight.  There is no discussion of the various factors recited in 20 C.F.R. §404.1527 which must be evaluated when assigning weight to a treating source opinion, such as the length of the treating relationship, the frequency of treatment, and other pertinent considerations, as required by Blakley.  The ALJ appears to have decided not only to reject Dr. Brown's two opinions but, without giving any explanation, to assign them no weight whatsoever.  This is error.

Further compounding the problem, the ALJ appears to have crafted a residual functional capacity for plaintiff without basing that finding on any specific medical opinions.  While that is not, in itself, reversible error when there is substantial evidence in the record supporting the ALJ's finding, see, e.g., Gatewood v. Commissioner of Social Sec., 2013 WL 308793 (S.D. Ohio Jan. 25, 2013), adopted and affirmed 2013 WL 530560 (S.D. Ohio Feb. 12, 2013), the ALJ here appears to have relied almost exclusively on the initial and reconsideration decisions to bolster his finding.  In fact, his RFC determination parallels that made by the reconsideration decision-maker, Dr. Hinzman.

Both of those earlier decisions were made, however, on the basis of only a few of the pertinent medical records.  Neither reviewer had the benefit of Dr. Brown's later records and opinions.  That renders any reliance on their findings problematic.  See Blakley, supra, at 409 (reversing ALJ's

-11-

reliance on state agency reviewers' opinions where they did not have the opportunity to review assessments made by treating sources); see also McCarty v. Astrue, 2011 WL 1235188, *7 (S.D. Ohio March 30, 2011)("it is ... inappropriate to found the key determination in the case on ... outdated assessments"). Without any reliable medical evidence on which to base an RFC assessment, the ALJ erred in making that determination, and the generic comment that the RFC assessment is "well-supported by the record as a whole," without specifying exactly what portions of the "record as a whole" support it, cannot save the case from reversal.

The Commissioner argues, however, that the ALJ had a proper basis for rejecting Dr. Brown's opinions because they were, in fact, based on plaintiff's own self-report of symptoms and the ALJ correctly determined that plaintiff was not fully credible. The Court does not view this argument as sufficient to cure the deficiencies already identified in the administrative decision - i.e. the failure to state what weight was given to the treating source opinions and why, the reliance on outdated medical opinions, and the lack of sufficient reasons (at least as articulated in the decision) for rejecting Dr. Brown's opinions - but it is an issue worth discussing.

Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible. The Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ offered the following reasons for finding plaintiff less than credible. When evaluating plaintiff's claim that fatigue and pain due to fibromyalgia prevented her from working a full day - something that plaintiff actually

-12-

experienced in her last job - the ALJ noted that objective tests such as x-rays of her various joints showed only mild arthritis and spurring and that she was not a candidate for spinal or other types of surgery.  The ALJ observed that her treatment was largely conservative and that she had not sought relief in an emergency room or hospital setting.

If plaintiff's claims related to a condition which can actually be observed through x-rays or other objective testing, or which can be remedied by surgery, these observations might carry some weight.  However, as the courts have consistently recognized, patients with fibromyalgia may have normal muscle strength and only minimal findings on x-rays, but still suffer from debilitating fatigue.  See, e.g., Preston v. Secretary of HHS, 854 F.2d 815, 820 (6th Cir. 1988).  Such findings "bear little relevance to [the] diagnosis of fibromyalgia."  Germany-Johnson v. Comm'r of Social Security, 313 Fed. Appx. 71, *7 (6th Cir. Nov. 5, 2008).  Consequently, such findings also cannot be used as the sole basis for finding a claimant who suffers from fibromyalgia, as documented by her treating source, less than credible when she reports symptoms of that disease.

The ALJ also found that plaintiff's activities of daily living were inconsistent with disabling symptoms.  In that regard, he cited to her ability to care for her dog, do laundry and other household chores, prepare meals, drive a car, shop, pay bills, count change, use a checkbook, manage a savings account, visit with friends, watch television, and make decisions.  Many of these activities require no physical exertion at all.  Plaintiff both testified and otherwise indicated that her physical activities, such as household chores, had to be done at her own pace and that she often rested in between such activities.  That evidence is not inconsistent with her report of disabling fatigue.  In short, even if the ALJ chose not to accept Dr. Brown's opinions solely because Dr. Brown relied on

plaintiff's description of her symptoms - and in a fibromyalgia case, that is the usual way in which physicians evaluate the severity of that disorder - the ALJ's assessment of plaintiff's credibility does not find substantial support in the record.

In light of these determinations, the Court finds it unnecessary to address plaintiff's final contention about inconsistencies between the Dictionary of Occupational Titles and the vocational expert's testimony. The ALJ did ask the expert to flag any such inconsistencies, and he did not, so the actual existence of an inconsistency may not be pertinent to whether the ALJ complied with SSR 00-4p, but this issue can easily be addressed on remand should the case require further testimony from a vocational expert.

## VII. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a

waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge